GARMAN TURNER GORDON LLP
GERALD M. GORDON
Nevada Bar No. 229
E-mail: ggordon@gtg.legal
MARK M. WEISENMILLER
Nevada Bar No. 12128
E-mail: mweisenmiller@gtg.legal
7251 Amigo Street, Suite 210
Las Vegas, Nevada 89119
Telephone (725) 777-3000
Facsimile (725) 777-3112
*[Proposed] Attorneys for Debtor*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>RKJ HOTEL MANAGEMENT, LLC, a Nevada limited liability company,<br><br>            Debtor. | Case No.: BK-S-21-10593-nmc<br><br>Chapter 11<br><br>Date:  **OST REQUESTED**<br>Time:  **OST REQUESTED** |

**OMNIBUS DECLARATION OF JEFF KATOFSKY
IN SUPPORT OF FIRST DAY MOTIONS**

I, Jeff Katofsky, hereby declare, under penalty of perjury under the laws of the United States of America, as follows:

1.  I am over the age of 18 and am mentally competent. I am a member of RKJ Hotel Management, LLC, debtor and debtor-in-possession ("**Debtor**"), and have served in that capacity since 2013. I am also the Debtor's Authorized Representative. In my capacity as a member and Authorized Representative of Debtor, I am familiar with Debtor's business, operational, and financial affairs. I am authorized to submit this Declaration in support of the Debtor's motions for "first day" emergency relief ("**First Day Motions**").[1]

2.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of Debtor's operations and finances, information learned from my review of relevant documents, and information supplied to me by other members of Debtor's management

---

[1] Unless otherwise noted, all capitalized undefined terms used herein shall have the meanings ascribed to them in the relevant First Day Motions.

and Debtor's various business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would competently do so.

3. On February 9, 2021 ("**Petition Date**"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned Chapter 11 case ("**Chapter 11 Case**").

4. Debtor intends to operate its business and manage and preserve its property as debtor-in-possession under Section 1107(a) and 1108.

5. I am advised by counsel that this Court has jurisdiction over the Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in this United States Bankruptcy Court District of Nevada pursuant to 28 U.S.C. §§ 1408 and 1409.

## I.
## GENERAL BACKGROUND

**A.    Debtor's Business and Assets.**

6. Debtor is a Nevada limited liability company that owns and operates the Delta Hotel Detroit Metro Airport ("**Hotel**"), located at 31500 Wick Road, Romulus, Michigan 48174 ("**Property**"), pursuant to a *Franchise Agreement* with Marriott International, Inc. ("**Marriott**"), dated March 22, 2018 ("**Franchise Agreement**").

7. The Hotel provides a seamless full-service hotel experience that has been designed with the essential needs of every traveler in mind. It is conveniently located minutes from the DTW airport, making traveling easy with a complimentary airport shuttle service. The Hotel has ample parking for overnight guests and quick access to I-94, making it is an easy drive to local attractions including The Henry Ford Museum and Detroit Zoo.

8. All guest rooms feature plush bedding, a mini-fridge and comfortable work desk with access to the 24-hour fitness center and indoor/seasonal outdoor pool.

9. The Hotel also has more than 15,000 square feet of flexible event space fit for small meetings or large celebrations and catering provided by the Hotel's in-house culinary team. The Hotel also seats up to 350 guests for weddings and provides related services.

10. The Hotel includes the mETRO pOLIS for breakfast, lunch, or dinner and Jyllian's Bakery for coffee and quick breakfast bite.

**B.    Debtor's Current Ownership, Management, and Staff.**

11. Debtor is owned by the following members: (i) the Katosky Family Trust (39%); (ii) Alexis Ariella, LLC (20%); (iii) Weisman Holdings, LLC (20%); (iv) Samra, LLC (15%); (v) SGR, LLC (5%); and (vi) WOFM Inc. ("**WOFM**") (1%).

12. WOFM is a Nevada corporation and Debtor's manager, appointed at the insistence of Rialto Mortgage as part of the Loan (as those terms are defined below), designed to prevent Debtor from filing a petition for bankruptcy protection under Title 11 of the United States Code ("**Bankruptcy Code**") through the appointment of an "independent director" chosen by Rialto Mortgage. The independent director is Anthony Palazzo ("**Palazzo**"). I am president and secretary of WOFM.

13. The Hotel is managed by Real Hospitality Group, LLC ("**RHG**"), pursuant to a *Hotel Management Agreement*, dated February 14, 2019, between Debtor and RHG.

14. As of the Petition Date, approximately twelve people are employed by a non-debtor professional employer organization ("**PEO**"), Incontheivable, LLC ("**Incontheivable**"), who work as Hotel staff. Debtor reimburses Incontheivable the payroll for the staff and pays the taxes directly to a PEO servicer, Champion HR. Continued service by the staff is vital to the value and preservation of Debtor's assets.

15. Debtor pays Incontheivable on a 14-day cycle. Debtor's last payment was made on January 29, 2021 for amounts through January 22, 2021. The next payment is due to be made on February 12, 2021 and will total approximately $20,000.

**C.    Debtor's Prepetition Capital Structure.**

16. *The Loan*. On January 14, 2020, Debtor and Rialto Mortgage Finance, LLC ("**Rialto Mortgage**") executed the *Loan Agreement*, pursuant to which Rialto Mortgage loaned Debtor the principal amount of Twenty Million Five Hundred Thousand Dollars ($20,500,000) ("**Loan**"), evidenced by a *Promissory Note*, also dated January 14, 2020, by Debtor.

17. *The Mortgage.* The Loan is secured by a *Mortgage,* dated January 14, 2020, under which Debtor purportedly granted Rialto Mortgage: (i) a mortgage in the; (a) land (the Property), (b) additional land, (c) improvements, (d) easements, (e) fixtures and personal property, (f) leases and rents, (g) condemnation awards, (h) insurance proceeds, (i) tax certiorari, (j) conversion, (k) rights, (l) agreements, (m) intangibles, (n) accounts, (o) causes of action, (p) accounts receivable, and (q) other rights; (ii) an assignment of leases and rents; (iii) a security agreement in real and personal property; (iv) a fixture filing; and (v) a pledge of monies held. Rialto Mortgage recorded the Mortgage on January 22, 2020 with the Wayne County Register of Deeds.

18. True and correct copies of the Loan Agreement, Promissory Note, and Mortgage are attached hereto as **Exhibits 1**, **2**, and **3**, respectively.

19. *Additional Loan Documents.* The following financing documents were also executed in conjunction with the Loan (referred to collectively with the Loan Agreement, Promissory Note, and Mortgage, "**Loan Documents**"):

   a. *Agreement Regarding Liquor Licenses*, dated January 14, 2020, by Debtor and Rialto Mortgage, under which Debtor agreed, in connection with a Post-Default Transfer (as defined therein), to provide cooperation and assistance to Rialto Mortgage regarding existing liquor licenses and new licenses.

   b. *Assignment of Leases and Rents*, dated January 14, 2020, by Debtor and Rialto Mortgage, under which Debtor assigned to Rialto Mortgage property, rights, interests and estates, now owned, or hereafter acquired, by Debtor, leases, rents, bankruptcy claims, lease guaranties, and proceeds, among other things.

   c. *Assignment of Management Agreement and Subordination of Management Fees*, dated January 14, 2020, by Debtor to Rialto Mortgage, and consented and agreed to by RHG under which Debtor assigned the Hotel Management Agreement to Rialto Mortgage and RHG agreed to subordinate its interest in the Management Fees (defined therein) to the terms and conditions of the Loan Documents and the liens created thereby as set forth therein.

   d. *Borrower's Affidavit*, dated January 14, 2020, by me.

   e. *Borrower's Certification*, dated January 14, 2020, by Debtor.

   f. *Cash Management Agreement*, dated January 14, 2020, between Debtor, Rialto Mortgage, and Wells Fargo Bank, National Association ("**Wells Fargo**").

g. *Certificate of Independent Director*, dated January 14, 2020, by Palazzo as Independent Director of WOFM, the managing member of Debtor.

h. *Deposit Account Control Agreement* ("**DACA**"), dated January 14, 2020, by Debtor, Rialto Mortgage, and Wells Fargo, under which Debtor and Wells Fargo acknowledged and confirmed that Debtor would establish with Wells Fargo the DACA Account (defined below), and that the DACA Account would be subject to the lockbox services provided by Wells Fargo in accordance with Section 7 of the DACA and Wells Fargo's standard lockbox policies and procedures.

i. *Environmental Indemnity Agreement*, dated January 14, 2020, by Debtor, me, and Rialto Mortgage, under which Debtor and I agreed to provide the indemnification, representations, warranties, covenants and other matters described in the Environmental Indemnity Agreement for the benefit of the Indemnified Parties (defined therein).

j. *Guaranty of Recourse Obligations* ("**Guaranty**"), dated January 2020, by me and Rialto Mortgage, pursuant to which I guaranteed payment and performance to Rialto Mortgage of the Guaranteed Obligations (defined therein).

k. *Spousal Consent*, dated January 14, 2020, by my wife, Jyll Katofsky, wherein she consented to the delivery of the Guaranty by me, among other things.

l. *UCC Financing Statements* filed by Rialto Mortgage with the (i) County Clerk of Wayne County, MI, and (ii) Secretary of State of Nevada, under which Rialto Mortgage purportedly perfected a security interest in Debtor's: (a) land (the Property); (b) additional land; (c) improvements; (d) easements; (e) fixtures and personal property; (f) leases and rents; (g) condemnation awards; (h) insurance proceeds; (i) tax certiorari; (j) conversion; (k) rights; (l) agreements; (m) intangibles; (n) accounts; (o) causes of action; (p) accounts receivable; and (q) other rights. Rialto Mortgage recorded a financing statement with the Nevada Secretary of State on January 14, 2020, and a fixture filing with Wayne County Register of Deeds on November 23, 2020.

20. True and correct copies of the Agreement Regarding Liquor Licenses, Assignment of Leases and Rents, Assignment of Management Agreement and Subordination of Management Fees, Borrower's Affidavit, Borrower's Certification, Cash Management Agreement, Certificate of Independent Director, DACA, Environmental Indemnity Agreement, Guaranty, Spousal Consent, and unfiled UCC Financing Statements are attached hereto as **Exhibits 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, & 16**.

21. The Loan Documents were purportedly assigned to, and are now held by, RSS WFCM2020-C55 – MI RHM, LLC ("**RSS**" and together with Rialto Mortgage, "**Rialto**").

22. *Prepetition Loan Obligations*. As of the Petition Date, the aggregate principal amount outstanding under the Loan was approximately $20,472,280.67.

D. **Events Leading to the Filing of the Chapter 11 Case.**

23. From the time it opened in 2018 through February 2020, the Hotel's business was brisk. The occupancy rates for most months of 2019 exceeded 70%, and the Hotel was operating at a profit. Like other airport-based businesses, the Hotel's viability is closely tied to the rate of airline passenger traffic. In April 2019, more than 3 million passengers moved through the Detroit Metro Airport. The Hotel was doing well. The obligations due under the Loan Agreement with Rialto Mortgage were current into May 2020.

24. Then the COVID-19 pandemic struck. By April 2020, the number of airline passengers decreased to approximately 178,000, a sharp downturn that has continued through today.

25. In March 2020, the Hotel's occupancy rate went from more than 80% to single digits overnight. Debtor attempted to keep the Hotel fully operational, but the losses were crushing. From March through August 2020, the Hotel lost approximately $425,000 per month, not counting what was due to Rialto Mortgage.

26. To make matters worse, the State of Michigan imposed an indoor dining ban, which prevents the Hotel from hosting airline employees, whose contracts require food service. The Marriott Franchise Agreement, for a full-service hotel, also has numerous requirements, such as the availability of a restaurant and bar to all guests.

27. Debtor had to do something to stop the bleeding, and it reluctantly decided to temporarily stop taking guests at the Hotel, which reduced the Hotel's losses by $200,000 per month.

28. Although the Hotel is not currently accepting guests and most of the staff are temporarily furloughed, the Property is fully maintained and not at risk of damage. Insurance is current.

29. Debtor and the Hotel are not in violation of the Franchise Agreement with Marriot, which has permitted the Hotel until March 15, 2021 to resume taking guests.

30. While the Hotel continues to suffer losses as a result of the pandemic, considering the state of Michigan's mandated indoor dining ban, and the decline in airline passenger traffic, the losses are substantially less since the Hotel stopped accepting guests and there is no imminent danger to the Property. Moreover, in light of government restrictions, travel volume is worse today then back in August 2020.

31. Since March 2020, Debtor has also attempted to work out a solution with Rialto.

32. However, Rialto's response to the global pandemic and the resulting economic downturn was to demand that Debtor agree to appointment of a receiver, with the intent to have the receiver reopen the Hotel and continue to operate it, albeit, at a much greater loss, given that Rialto had no plan to stem the losses caused by a global pandemic and economic crisis.

33. When Debtor would not agree to the appointment of a receiver, RSS filed a *Verified Complaint* against Debtor, in the State of Michigan in the Circuit Court of the County of Wayne ("**Michigan State Court**"), averring causes of action for breach of contract, judicial foreclosure of mortgage, judicial foreclosure of personal property, and appointment of a receiver.

34. On January 4, 2021, RSS filed a motion to appoint a receiver of Debtor in the Michigan State Court. A true and correct copy of the motion to appoint a receiver is attached hereto as **Exhibit 17**. On January 22, 2021, the Michigan State Court orally granted the motion to appoint a receiver. Rialto submitted a proposed order to the Michigan State Court providing the receiver the right to immediately list and sell the Property to avoid Michigan's foreclosure statutes. Debtor objected to the proposed form of receivership order and the objection was set for hearing to occur before the Michigan State Court on February 12, 2021.

35. On February 5, 2020, prior to the February 12 hearing on Debtor's objection, the Michigan State Court inadvertently issued the proposed order. A true and correct copy of the receivership order is attached hereto as **Exhibit 18**. The Michigan State Court held a telephonic hearing on February 9, 2021 and indicated that it would be rescinding the inadvertently issued receivership order. Regardless, the proposed receiver did not act on the receivership order.

36. Notwithstanding Rialto's efforts, the value of Debtor far exceeds the value of the combined debt under the Loan with Rialto and Debtor's other creditors.

37. Further, Debtor entered an agreement with Lodging Fund REIT III OP, LP ("**REIT**") on December 15, 2020, for total consideration of $33,000,000 to contribute the Hotel to the REIT as a form of sale. The REIT had offered, *inter alia*, to bring current the Loan with Rialto Mortgage and assume the Loan with modified terms. Rialto Mortgage declined the offers from the REIT and Debtor in order to take Debtor's significant equity for itself.

38. Moreover, Debtor intends to reopen the Hotel in March 2021. To facilitate the reopening and fund the administrative costs of the Chapter 11 Case, Debtor is assessing seeking Court approval of an unsecured administrative loan.

39. As such, Rialto's action to appoint a receiver and foreclose upon the Property endangers the interests of Debtor and the members of Debtor.

40. As President and Corporate Secretary of WOFM, on February 5, 2021, I issued a *Notice of Special Meeting of the Board of Directors of WOFM, Inc*. for 8:00 a.m. (pst) on February 8, 2021, to consider and authorize the filing of this Chapter 11 Case. At the meeting, I was present. Although the independent director, Palazzo, was properly and timely notice of the special meeting, he did not attend. The filing of the Chapter 11 Case was approved, and I was empowered as the Authorized Representative for Debtor to execute and file on behalf of the Debtor, all petitions, schedules, lists, applications, pleadings and other motions, applications, papers, agreements, consents or documents, and to take any and all action that I deem necessary or proper to conduct the affairs of the Debtor in this Chapter 11 Case, including, without limitation, to negotiate, file and confirm a plan of reorganization. A true and correct copy of the *Resolution* is attached hereto as **Exhibit 19**.

41. Consequently, Debtor determined that it is in its best interest to file a voluntary petition under Chapter 11 of the Bankruptcy Code to preserve the value of its assets, including the Property, for the benefit of all parties in interest. The filing will afford Debtor the opportunity to stabilize and preserve the value of its business and explore restructuring alternatives.

E. **The Goals of this Chapter 11 Reorganization.**

42. Debtors intends to use the Chapter 11 process to evaluate all of its restructuring options and to preserve and maximize value for stakeholders.

43. The overall goal is to restructure its debt and capital structure.

## II.
## FIRST DAY MOTIONS

44. Debtor filed or expects to file the First Day Motions described below. The following is only intended to be a summary of the First Day Motions. The full grounds for the relief sought in the First Day Motions is set forth in each of the same.

45. Debtor filed its First Day Motions to allow it to efficiently and effectively operate in its Chapter 11 Case. The relief sought in the First Day Motions is critical to Debtor's limited business operations, will allow for a comprehensive and smooth transition into Chapter 11, and will ensure that Debtor is able to maintain and preserve the value of its assets for the benefit of its estate and creditors.

46. The First Day Motions seek relief to allow Debtor to meet necessary obligations and fulfill its duties as debtor-in-possession and minimize the adverse effects of the Chapter 11 filings on its businesses. I am familiar with the contents of each First Day Motion and believe the relief sought therein is (i) necessary to enable Debtor to maintain its limited business operations during the pendency of the Chapter 11 Case with minimal disruption or loss of productivity and value, (ii) critical to achieving a successful restructuring of Debtor, and (iii) in the best interests of Debtor, its estate and all stakeholders.

A. **Motion of Debtor for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services to, or Discriminating Against, Debtor on Account of Prepetition Amounts Due; (II) Deeming Utility Providers Adequately Assured of Future Performance; (III) Authorizing Debtor to Establish the Adequate Assurance Deposit Accounts and Pay the Adequate Assurance Deposits; (IV) Establishing Procedures for Objection to the Adequate Assurance Procedures; and (V) Granted Certain Related Relief.**

47. In the *Motion of Debtor for Entry of Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Companies From Altering, Refusing or Discontinuing Services to, or Discriminating Against, Debtor on Account of Prepetition Amounts Due; (II) Deeming Utility Providers Adequately Assured of Future Performance; (III) Authorizing Debtor to Establish the Adequate Assurance Deposit Accounts*

GARMAN TURNER GORDON
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

*and Pay the Adequate Assurance Deposits; (IV) Establishing Procedures for Objection to the Adequate Assurance Procedures; and (V) Granted Certain Related Relief* ("**Utilities Motion**"), Debtor seeks entry of an interim order substantially in the form attached thereto as Exhibit 2 ("**Interim Order**"): (i) prohibiting the Utility Providers from altering, refusing, or discontinuing service to Debtor on account of unpaid amounts for prepetition utility services, including the making of demands for security deposits or accelerated payment terms, pending entry of a final order granting the relief sought therein in substantially the form attached thereto as Exhibit 3 ("**Final Order**"); (ii) providing that the Utility Providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code based, *inter alia*, upon Debtor establishing a segregated account containing an amount equal to fifty percent (50%) of Debtor's estimated average monthly cost of utility service, which may be adjusted by Debtor for reasons specified herein; (iii) establishing procedures for resolving requests for additional adequate assurance and objections to the Utilities Motion; and (iv) authorizing, but not directing, Debtor to provide additional adequate assurance of payment to the Utility Providers if required.

48. Uninterrupted utility services are essential to Debtor's ongoing operations and the value of its assets. A disruption of these services would likely be costly to Debtor and harmful to its business and the value of its assets, as Debtor would be forced from the outset of the Chapter 11 Case to focus on finding replacement Utility Providers and services, where possible, rather than focusing on efforts to preserve and maximize the value of Debtor's estate. Moreover, the business disruption that would likely result from interruption of these services would likely damage customer relationships, revenues, and profits and could adversely affect Debtor's efforts in the Chapter 11 Case, to the detriment of its estate, creditors, and staff. It is therefore critical that all utility services currently provided to Debtor continue uninterrupted.

49. In connection with the operation of its business and management of its property, Debtor incurs utility expenses in the ordinary course of business for, among other things, water, sewer service, electricity, gas, local and long-distance telecom service, internet service, waste disposal and other similar services (together, "**Utility Services**"). On a monthly basis, Debtor

spends approximately $36,000 per month on Utility Services. A non-exhaustive list of Debtor's Utility Providers, as of the Petition Date, is attached to the Utilities Motion as Exhibit 1.[2]

50. Therefore, the Adequate Assurance Deposit by Debtor will be $18,000.

**B.  Debtor's Motion for Interim and Final Orders (I) Authorizing Maintenance of Prepetition Cash Management System and BofA Account; and (II) Granting Related Relief.**

51. In the *Motion for Interim and Final Orders: (I) Authorizing Maintenance of Prepetition Cash Management System and BofA Account; and (II) Granting Related Relief* ("**Bank Accounts Motion**"), Debtor requests interim and final orders granting all of the following relief:

a. that Debtor is authorized and empowered to: (1) maintain its Cash Management System and BofA Account in existence as of the Petition Date; (2) treat the BofA Account for all intents and purposes as a debtor-in-possession account; (3) use, in their present form, existing checks and other documents related to the BofA Account; (4) pay from the BofA Account prepetition and postpetition ordinary course bank fees in connection with the BofA Account; and (5) perform their obligations under the documents and agreements governing the BofA Account;

b. that Debtor shall maintain records of all transfers and transactions so that all transfers and transactions are adequately and promptly documented in, and ascertainable and traceable from, Debtor's Accounting Program;

c. that regarding the BofA Account, BofA is authorized and directed to: (1) continue to administer, service, and maintain the BofA Account as such account was administered, serviced, and maintained prior to the Petition Date without interruption and in the usual and ordinary course; and (2) pay any and all checks, drafts, wires, automated clearinghouse (ACH) transfers, electronic fund transfers, or other items presented, issued, or drawn on the BofA Account (collectively, "**Debits**") on account of a claim arising on or after the Petition Date so long as there are sufficient collected funds in the BofA Account and in accordance with the agreements governing said BofA Account, including, without limitation, any prepetition cash management agreements, merchant service agreements, or treasury services agreements;

d. that no Debits issued on the BofA Account prior to, but presented after, the commencement of Debtor's Chapter 11 Case are honored or paid, other than the Permitted Checks (defined below) explicitly provided for herein, or as otherwise

---

[2] While Debtor has exercised its best efforts to list all of its Utility Providers and account numbers in Exhibit 1, it is possible that certain Utility Providers and/or account numbers may have been omitted from this list. Debtor reserves the right to amend Exhibit 1 to add any Utility Providers and/or account numbers that were omitted therefrom and to request that the relief requested herein apply equally to all such entities and accounts. Furthermore, the relief requested herein shall apply to all of Debtor's accounts with every Utility Provider listed in Exhibit 1 regardless of whether each such account is contained in Exhibit 1. In addition, Debtor reserves the right to argue that any of the entities now or hereafter listed in Exhibit 1 are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

permitted by Court order after notice and a hearing;

  e. that the Debtor will promptly provide BofA with a list of pre-Petition Date checks that BofA is authorized to honor ("**Permitted Checks**"). If a vendor that was issued a Permitted Check refuses or is otherwise unable to re-present the prepetition check for payment, Debtor is authorized to issue a replacement check or cashier's check, as requested by such vendor;

  f. that those certain existing deposit agreements between Debtor and BofA regarding the BofA Account shall continue to govern the postpetition cash management relationship between Debtor and the BofA, and that all of the provisions of such agreements, including, without limitation, the termination and fee provisions, shall remain in full force and effect;

  g. that Debtor and BofA, without further order of this Court, agree to and implement changes to the Cash Management System and procedures in the ordinary course of business, including, without limitation, the opening and closing of bank accounts;

  h. that nothing contained in the Bank Accounts Motion or its subsequent order may prevent Debtor from closing the BofA Account as it deems necessary and appropriate;

  i. that Debtor reimburses BofA for any claim arising prior to or after the Petition Date in connection with Debits deposited with BofA which have been dishonored or returned for insufficient funds in the applicable accounts;

  j. that BofA implements reasonable handling procedures to effectuate the terms requested in the Bank Accounts Motion and not be liable to Debtor or its estate, or otherwise held in violation of the Bank Accounts Motion or its subsequent order, for honoring a prepetition Debit or other Debit: (1) at the direction of Debtor that such prepetition Debit or other Debit be honored; (2) in the good faith belief that the Court has authorized that such prepetition Debit or other Debit be honored; or (3) as a result of an innocent mistake made despite implementation of such handling procedures;

  k. that, to the extent any other order (if any) is entered directing BofA to honor Debits made, drawn, or issued in payment of prepetition claims, the obligation to honor such items are subject to the order granting the Bank Accounts Motion;

  l. that Debtor and BofA are authorized and directed to continue to perform pursuant to the terms of any prepetition documents and agreements governing the BofA Account, except and to the extent otherwise directed by the terms of the order;

  m. that BofA is authorized to continue offsetting any funds deposited in the BofA Account by Debtor to the extent necessary to cover any fees, charges, and assessments set forth or provided for in the agreements governing the BofA Account or as otherwise permitted in the ordinary course of business pursuant to the agreements governing the BofA Account; and

  n. that Debtor and the CC Processor are authorized to perform their

obligations pursuant to the terms of the agreement between Debtor and the CC Processor. Debtor seeks authorization to do and perform all acts, to make, execute, and deliver all instruments and documents, and to pay fees, charges, and expenses which may be required or necessary for Debtor's performance under any agreements with the CC Processor.

52. Debtor has one centralized cash management system ("**Cash Management System**") to collect and transfer funds generated from Debtor's operations.

53. In the ordinary course of its business, Debtor utilizes the Cash Management System to efficiently collect, transfer, and disburse funds generated through Debtor's operations.

54. Debtor has the following three unrestricted bank accounts utilized in the Cash Management System (together, "**Bank Accounts**"):

- Bank of America ("**BofA**") – ending in 6451 ("**BofA Account**") is utilized as the depository for cash and credit card payments received by Debtor from operations, that are then swept from the BofA Account and deposited into the General Account and, if needed, from the General Account into the Petty Cash Account (as those terms are defined below). Any checks issued from the BofA Account are to the General Account. There are no ACHs other than credit card processing and related fees.

- US Metro Bank - General Account – ending in 3157 – ("**General Account**") receives funds from the BofA Account, is utilized to pay vendors, and transfer funds to the Petty Cash Account as needed.

- US Metro Bank – Petty Cash Account – ending in 4056 – ("**Petty Cash Account**") is utilized for petty cash as needed.

55. BofA is an "authorized depository." Because Debtor requires a bank with a local branch in Michigan to accept cash and check deposits and Debtor already has established the CC Processor arrangement with the BofA Account, which arrangement could take more than a month to replace, Debtor's continued maintenance of the BofA Account is necessary

56. Debtor understands that US Metro Bank is not an authorized depository, and as such, Debtor is in the process of closing the General Account and Petty Cash Account at US Metro Bank and opening a debtor-in-possession account with BofA. As such, Debtor will maintain the BofA Account and the new debtor-in-possession account with BofA (the "**DIP Accounts**") during the pendency of the Chapter 11 Case.

57. In conjunction with the Loan, Debtor was to open two or more restricted bank

GARMAN TURNER GORDON
Attorneys at Law
7251 Amigo Street, Ste. 210
Las Vegas, NV 89119
725-777-3000

13

accounts at Wells Fargo (together, "**Restricted Bank Accounts**") to be subject to the Cash Management Agreement and the DACA. However, because Wells Fargo did not have a local branch in Michigan to accept cash and check deposits, the Restricted Bank Accounts were never opened.

58. The DIP Accounts will tie into and provide data to Debtor's Accounting Program (defined hereinafter) to accurately record such collections, transfers, and disbursements as they are made.

59. Specifically, Debtor uses M3 Hospitality Accounting - Analytics Software ("**Accounting Program**").

60. Additionally, Debtor has an agreement with credit card processing company JPMorgan Chase Bank, N.A. in its capacity as a member of several Card Networks and Paymentech, LLC ("**CC Processor**"), that deposits credit card payments received by Debtor into the BofA Account.

61. Allowing Debtor to maintain its Cash Management System will help to ease the transition into Chapter 11 and eliminate administrative burden. Without the relief requested in the Bank Accounts Motion, Debtor would be required to close its existing BofA Account, open a new bank account at a cooperating depository, imprint new checks with the "Debtor-in-Possession" label, and reestablish the arrangement with the CC Processor and the new account at a time when Debtor needs to focus on reopening the Hotel and its reorganization effort. Complying with such requirements will needlessly burden Debtor without a corresponding benefit to parties in interest.

62. The Cash Management System is an ordinary, usual, and important business practice. The Cash Management System enables Debtor to maintain control over the receipt and disbursement of cash, and to generate timely and accurate financial information critical to managing Debtor's business during the pendency of the Chapter 11 Case. If these practices and procedures are disrupted, Debtor's effort to reorganize may be jeopardized.

63. The Cash Management System is similar to those commonly employed by corporate enterprises of comparable size and complexity. Many corporate enterprises use the

cash management system because it provides numerous benefits. Among the most important of these benefits is the ability to control corporate funds and ensure cash availability, to reduce the cost of borrowed funds, to reduce administrative expenses, and to have easy access to timely and accurate financial information.

64. Establishing a new cash management system would entail significant delay and cost, particularly considering the system's complexity and reliability. At a minimum, substantial disruptions to Debtor's business would occur by, among other things, delaying collection and disbursement of the payments to vendors and customers. This would in turn harm stakeholder confidence, thus disrupting mutually beneficial relationships with trade creditors and customers, among others. Such a negative impact on Debtor's operations would hinder a successful reopening of the Hotel and reorganization in Chapter 11.

65. Maintaining the existing Cash Management System, BofA Account, and CC Processor, and establishing the DIP Accounts with BofA, will not prejudice any party. Debtor will maintain strict records with respect to all transfers of cash so that it is able to readily account for all transactions. Debtor's maintenance of its existing Cash Management System is not only of critical importance to Debtor's business operations but is also in the best interests of Debtor's estate and creditors.

66. If the Cash Management System, BofA Account, or CC Processor is disrupted, Debtor will experience immediate and irreparable harm.

67. In view of the urgency of the relief requested in the Bank Accounts Motion and the risk to Debtor's operations if Debtor's Cash Management System, BofA Account, or CC Processor is interrupted, a fourteen-day stay of the relief sought herein is impractical.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED this 12th day of February, 2021.

By: /s/ Jeff Katofsky
JEFF KATOFSKY